At Police Court, the defendants in this case are in front of you today. Jason Carpenter and Chris Small served as ATF Cohort Operatives for seven years. The last two years, under the evidence that has no significant controversy, 100% of the operation they did through their Big Sky management account was government operation, no traditional tobacco operation at all. This was done at the ATF's request, under their direction, and under their control. The district court, through Judge Fox, who had the case for four years, found twice that Mr. Carpenter and Mr. Small were federal employees acting within the scope. Well, if you're an employee for Westfall Act purposes, does that mean once you're an employee, you're always an employee, or are there some actions they might be employees on and other actions they would not? I would say the latter, Your Honor. What they're doing in this case, though, is we're not asking for a, you know, you get tapped one time with a wand and that's it for all time. What we're talking about is that as the plaintiffs conceded at the full-day evidentiary hearing in front of Judge Fox in August of 16, the transactions that they say are at the heart of their complaint, all occurred after May 1 of 2011 when the asset purchase agreement was closed and their traditional tobacco business, that is Mr. Carpenter and Mr. Small's traditional tobacco business, was transferred to the plaintiffs. So were they employees for purposes of the asset purchase agreement? I'd say for the purposes that they complain about, they were, because they're saying that the assets were overpriced. Now, the interesting thing about that is that that was a theory that was not advanced by their damages expert. They stipulated at the 30B6 deposition of the plaintiffs that they were seeking no damages that were not in their experts' report. And we've rebutted the overpricing issue and have had nothing in response. Plus, Judge Fox found that the overpricing, alleged overpricing, was within the scope, both of their federal, well, that they were federal employees in that performance, and it was within the scope. And in the reconsideration order, the district court did not even address that issue. They did not find that to be incorrect, and I respectfully submit that would remain law of the case because it's never been dealt with in a negative way. That is the finding on that issue, and the district court, in the reconsideration order, didn't mention it once. All they talked about were the post-2011 sales of brand B cigarettes, which every ATF agent that testified about it, that had personal knowledge of it, said, yes, those were things we asked them to do. They were part of pursuing a top ten in the world DEA target. Let me ask you, is it your view and effect that the plaintiffs have waived an argument that they can pursue their tort case as it concerns the asset purchaser? That would be my contention, Your Honor. They didn't address it. Well, they talked about it on the field, but the district court, at this point, didn't find anything about it. And, again, we would say that under Antone and Wooden, you've got a problem there because, supposedly, they had a page and a half out of a 35, 40-page brief that talked about that. The district court didn't deal with it at all. Judge Fox's holding on that has never been judicially rebutted. Now, the other thing... Let me ask you a question I couldn't understand. I'm trying to understand what exactly it is you're appealing, particularly with regard to Judge Ball's action. Now, in order for an interlocutory appeal to be revisited and changed ultimately, the three requirements have to be met. Now, are you appealing the question of whether or not those requirements were met before going into the merits? We are, and thank you, Your Honor. It is a three-part test. You have to have substantial new evidence. You have to have change in the law. Or one of the three. You have to have one of those three. Now, there was no change in the law. Every case, it was cited to Judge Ball. So where do you make this argument in your brief? We allude to it on page 36 of the appellate's brief, Your Honor. We set out the standard. You allude to it or you make it? I would respectfully say make it. We had the pages we had, Your Honor. 36? Is that what you're saying? 36, Your Honor. Okay. So, again, as Judge Drexler, as you point out, you've got to have one of the three. You clearly didn't have the last two. It wasn't discussed. It wasn't even contended. The only thing you allegedly had was the first one. And what was that only piece of newly discovered evidence? It was an April 2011 ATF memo that, at the time of the hearing, was six years old. And the memo itself says, the district court again, fam. I'm sorry to keep you interrupted. No, sir. Is your argument that, because I'm not seeing much on page 36, is your argument that Judge Boyle didn't have the authority to enter the reconsideration order or it's just wrong? It's both, Your Honor. I would say that we've got a two-part analysis here. The first is the threshold for 54B review was not met because, first of all, the newly discovered evidence itself. But that may not be a question of authority. That may be putting too fast a point. I apologize if I'm overstating, Your Honor. That's all right. Go ahead. But the memo itself says at the appendix, page 552, from the policy itself, that it's solely for purposes of internal bureau guidance. It's not intended to and may not be relied upon to create a right, substantive procedural enforceable by any law in any matter, civil or criminal, and places no limitations on otherwise lawful investigative or litigation prerogatives of the DOJ. So it says on its face that it does not do what the district court held that it did, and that is to place what Chris Small and Jason Carpenter were doing beyond the scope of their authority. The second problem with that is that North Carolina law on scope of employment, which that passage of the opinion was alluding to, says you've got to look at the purpose and not the method. And the purpose here was clearly to try to catch tobacco criminals, funders of international terrorism. And there's no evidence that that memo said they could not do that. Plus, even if it violated DOJ policy, the fact that it's unauthorized or even unlawful, as long as it is a means, or as long as its purpose is to accomplish the employer's objective, it's within the scope. So that's where we would say that the court fell into error twofold. First, in looking at this piece of evidence, it did not establish what they said it did. And secondly, even if it did limit the authority of the ATF, that doesn't matter, both under the North Carolina precedents that are governing and even under the explanation of this court's decision in Merritt, which was using, I think, Maryland law, but it tracks the same way North Carolina law goes. The other thing I want to talk about in a minute, and I'm always a little loath to do this because having done this for a long time, to stand in front of an appellate group or appellate court, forgive me, and say clear error feels a little bit like running into a spinning propeller. But what we have here, based on Antone and on Wooden, is a classic example of ignoring substantial evidence contrary to what the court found. And that comes from the simple fact that the court here, in its opinion, did not engage in resolving credibility of the evidence. You're talking about the reconsideration. I am, Your Honor. Okay. That's what we have. I'm sorry. I'm jumping around a lot. Forgive me. You talk about both orders in your brief in some ways interchangeably, so I just wanted to make sure. Well, and I'm well aware. I'm sensitive to the fact that, yes, what we have in front of you is a reconsideration order, and some of the effort to compare and contrast is to look at the level of review of the record between the two, and with all respect, we say it doesn't really compare particularly strongly. The other thing that I found significant, as somebody who's done this for a good while, is that in this order, which under the Westfall decisions is not a summary judgment order but an actual resolution by the district court as fact finder without a jury, the court here found that there was, and forgive me. I want to be sure I say this correctly. The court found that there was no evidence that ATF had the authority to control the defendant's actions, that there was no evidence that they exerted control over the defendant's actions, and that the court was unaware of any evidence that they could not have refused the call at any time. Now, those appear at 626, 627, 628 of the appendix. The thing that I thought was curious about that is that Judge Fox found with pinpoint sites throughout the same evidence that was in front of the district court in November of 16, that there was plenary evidence of each of those things. There was no new evidence other than the April 2011 memo in front of the court on the reconsideration order. It was not in front of the court on the original petition to substitute and the first reconsideration order, which Judge Fox found was not even close enough that he would consider certifying it for immediate appeal, and he rejected that motion in January of 17. Let's say we agree with your contention that there was authority to control every cigarette sale action. Is that not also evidence of self-dealing on the part of the clients that would indicate that the analysis changes with that? Respectfully, no, Your Honor. I think there's contentions of that, there's innuendo of that, but there is no direct evidence of that. The only direct evidence cited in the appellee's brief was kind of a rabbit out of the hat argument they made in the afternoon of the full day hearing in front of Judge Fox in August of 16, and if I may have a minute to locate it, I won't be able to give you a pinpoint site. But before you go there, I'm just trying to... Yes, sir. Because this rubbing off case and the whole scheme in which it's described goes on and on. I'm trying to understand in terms of your clients, if they are indeed under control, but then they sell the company, so to speak, stay on, and then continue by selling back cigarettes that actually belong to the company that they went, even if that's established or not. Somewhere in the midst of this, there's a ton of property. Yes, I understand. What was it, $1,212? What is it? A lot of money. Did it all go to your clients? No, sir. Where did it go? Did it go back to ATF? What did they do with these properties is what I'm trying to understand. Let me take a moment and walk through that, if I may. And, again, I'm just not trying to hold anybody up. The way this worked was simply this. There are two kinds of accounts that were involved here, as you can tell from the record. There's a management account. There's a churning account. The churning accounts originated with money appropriated by Congress, about $50,000 that I think was seed money, but it could only be used to purchase products from individuals who were known targets. What ATF found in working intimately with Mr. Karpner and Mr. Small is that if there were suspected targets, they couldn't use churning money for it. So what they wound up doing was going to Mr. Karpner and Mr. Small and saying, we need you to advance money out of your personal funds in order to fund purchases from people we suspect but we don't know yet. And if profits are made on that, keep them in a separate management account because we can't commingle them with the churning account. So they did not commingle them. And as Agent Lesmak testified in his deposition, they reached a point which they were a million or more dollars in the hole. But what happened was, okay, the first layer. A million in the hole because your clients were advancing their personal money? Yes. A million dollars. A million dollars at least. Our clients say more, as much as $2.5 million at one point. What was in that other account that sort of, I don't know, sounds like a slush fund to me, but it's kind of an extra. What was in that extra? The churning account was the original government funding, and they would make the government. What was in the other? What was in the management account, the evidence is uncontradicted, is after the APA closed, that was 100% government money. Everything that went in, went in because of government operations. Everything that went out, went out because of government operations. If an infusion of capital was needed in order to buy a vehicle for an ATF office in Savannah to use on some kind of sting, it got bought. Our guys paid for it. And at some point, out of this extra account, they put their own money up to pay it, and then as they made profits, as the profits flowed in to the management account, at some point there would be a reconciliation of the account at the end of an operation. Let me just ask the question I really want to ask you. I'm sorry. Did ATF benefit from this scheme? Yes. How so? How so is that it's uncontradicted that our clients would rent storefronts for them, would provide credit cards for ATF? They would benefit monetarily. That's what I'm saying. Yes. They would fund all kinds of expenses for them that they couldn't be funded out of the churning account, and then at the end there would be an audit and a reconciliation. Wait a minute. Is this money, because I'm trying to follow Judge Wendt's questions and your answers, is this money you're talking about now the money that came from what they put up or out of this churning account? What they put up, Your Honor. Okay. Sorry. I was trying to follow all the moving parts here. Forgive me. Every time I try to tell this story, the first time it takes an hour and a half. I apologize for the confusion. You said what they put up. What about the profits that they made? Was that part of the money too? The profits that they made were simply this. They were told by Agent Lesnack they could keep up to $2 a cart to pay them for the work they were doing, which would involve flying all over the world, flying to South America to try to create a rate relationship with this DEA Top Ten target. They got to keep $2 a cart, and the rest of it would go into the federal forfeiture fund after it was audited by ATF at the end of the operation. So the millions of dollars went to the government? Yes. So let me ask you about a specific exchange with Agent Lesnack. And he's testifying, and this is, I take it, a post-asset purchase agreement transaction because it involves Palermo Cigarettes or whatever. Yes, sir. Are Palermo's and Brand B the same thing? Yes, sir. Okay. So he's asked, did you or anybody else with the ATF impose any restrictions on your clients on what they could do with Palermo's? Did they sell to anybody they wanted to? Yes. So you did not tell them that they had to sell this product to DSW, which I think are the plaintiffs? Yes, sir. No, I never had that conversation. They had the freedom to sell to whomever they wanted to, correct? So, I mean, in that circumstance, are they, based on the agent's testimony, are they employees when they make that sale to the plaintiffs? They are, Your Honor, because they're permitted to make that sale. The sale is made at a price set by Agent Lesnack because he also testified he set the price on every operation he had. Mr. Small testified they would get the prices from Agent Lesnack or somebody like him. So it's a project of Agent Lesnack to sell. He also covers transactions with, for lack of a better word, innocent third parties? Well, in this situation, Your Honor, contrary to what the plaintiffs are asserting, every one of these prices were set, and it's undisputed in the record that they were set at $2 a carton below the market rate when they were sold to the plaintiffs to be sure that the plaintiffs made at least $2 a carton on every transaction. So the whole point here was to make sure that the plaintiffs made money on these deals. And the money, I would submit to you that if we had sold these cigarettes to someone else at this price without selling them to the plaintiffs, then we would be here in front of you being sued because we gave that opportunity to somebody else. But there seems to be some sort of question as to you've got cigarettes coming from people they're working for to them, and then they sell them back to the very people for worth 200%. It seems to have been somewhere, I heard. Yes, sir. And you're saying even with 200%, the company's still making money because it's $2 per carton. Yes, sir. But the 200% doesn't matter, and that's what I've been asked about. What happened with the 200% profit? ATF. Went into ATF? It was used to fund ATF operations. The only thing our clients kept was $2 a carton, and it had to be approved by ATF at the close of every operation. And that's what's in the record, Your Honor. I think I should shut up now. You've got some time, sir, for replying. Thank you, Your Honor. Yes. Let's hear from the plaintiffs. May it please the Court. Patrick Demaroff on behalf of the government. I'm hoping to use eight minutes, and then the plaintiffs' counsel will use the rest of the time. Now, the Attorney General's designee here concluded. What are you going to talk about for eight minutes? I imagine our arguments might overlap. Our position is limited to the employment determination. The Attorney General's designee declined Westfall Act certification here because he determined that the defendants were not federal employees, and so that's what I'd like to address. And, of course, the district court correctly agreed with that determination. Now, defendants here owned and operated their own legitimate tobacco distribution business, which they allowed to be used for undercover operations. And what's important is both with respect to their undercover investigations and their legitimate business, the defendants were taking the exact same actions. So they had control over the day-to-day operations of the warehousing, the transporting, the logistics. I asked you about this on page 423. It's questioning of Agent Whittlemore. And he's asked, do you call the shots on what product providers APF used? Yes. And who to sell to? Yes. And what price to charge? Yes. And what price to pay? Yes. That would seem to indicate that there's some degree of control here. So what that indicates, Your Honor, is control over the scope of the undercover investigations itself, which is what you would expect in any confidential informant arrangement. But what is not disputed and what defendants can do is what price to charge and what price to pay. That would not seem to leave them a whole heck of a lot of discretion. Well, it does leave discretion as to all the day-to-day operations of the warehousing, the transporting, all the operations of the business. And just to be clear, if you look at all the cases decided by the Supreme Court in this court involving, you know, whether someone falls as a federal employee. As I understand it, and I'll admit that some of this is a tad confusing, nobody's brought an action based on how well they operated a forklift to move one pallet of cigarettes from one place to the other. It's all about money. And this testimony seems to go to money. I understand that, Your Honor. But in determining whether someone's an employee, the question isn't what the tortious conduct was at issue. The question is. This is such a different animal than your traditional master-servant, employer-employee type analysis. I mean, this is law enforcement, federal law enforcement, using a legitimate business as a front to catch criminals. You know, and obviously they're not going to go, law enforcement's not going to go tell people running a legitimate business exactly how to do their business. They want them to keep doing the same thing they've always been doing. So there's nothing unusual or nothing that's going to alert the criminal that this is something out of ordinary. So with that understanding, go ahead with your argument. Right. And I completely agree with everything you just said, Your Honor. And all of that precisely underscores why the defendants couldn't have been federal employees here. And the comparison of this case to independent contractor cases, which of course is where this more regularly comes up, is stark. And it shows how little control the government had over the day-to-day operations of defendants' business. The fact that defendants were business owners, it just shows. It's very odd to think that someone who owns their business, who has complete control over selling their business, can stop it at any point, is somehow an employee of the federal government. As I understand their position, though, the government had control over the particular actions that's getting them sued. Well, first of all, that's not the case, Your Honor, and we can go through those actions. But more importantly, in figuring out whether someone's an employee, you have to look at the entire relationship. And that's what this court said, for example, in ARA Leisure Services. And so control is a prerequisite. And as we've already discussed, defendants were business owners, so they had control over the day-to-day operations. But also this court looks at a lot of other factors. So it looks at, is the individual engaged in a distinct business? Well, here, again, they're business owners, so yes. Is the individual using their own equipment? Yes. The defendants were using their own warehouses and their own employees. Is there any indication that the parties intended to form an employee relationship? Here, there's no agreement other than a confidential informant agreement between Carpenter and the government, and that agreement expressly states that Carpenter was not a federal employee. So on the control factor, they haven't shown the day-to-day control necessary to satisfy an employee relationship. And then all the other factors weigh against them being employees. And, in fact, they don't even attempt to argue that any of those factors weigh in favor of them being employees. And just to turn to the case law, because I think it is very helpful. For example, if this court looks at Orleans, the individuals there were part of a community action agency. That agency was funded by the government. It was created pursuant to a federal statute which structured the agency, which directed what its operations should be. The agency had to get approval for its program from the government, and yet the Supreme Court had no problem finding that that agency's employees were not federal government employees precisely because the government did not have control over their day-to-day actions. And here, again, defendants concede. I mean, their whole point of being in business is that we want to buy cigarettes and sell them for more money than we bought. Otherwise, we're going to go out of business. So if the government, and there appears to be evidence, actually on both sides, but there is evidence that the government was telling them, this is who you're going to sell to. This is how much you're going to buy the cigarettes for. This is who you're going to buy them from. And you're going to sell them for this price or even within a range to this person over here. It's just from a common sense standpoint, I'm not understanding what employment discretion of any meaningful part there is left over. I mean, they don't, the essence of their operation to buy and sell cigarettes seems to be controlled by the government. Well, first I want to push back on one factual part of your question and then if I could address sort of the legal analysis. Tell us what the facts are. You should cite to the record if you can because we're anxious for knowledge. And I don't know if I have a record for this precise point, but I think as defendants counsel conceded, following the sale of the business to plaintiffs, Big Sky's transactions, the tobacco products that they were selling were legal domestic products. ATF did not have control to tell them who to sell the products to. They chose to sell them to plaintiffs. And that's in the record, and I don't think defendants dispute that. Now, on the legal point, if you look at, for example, Logue or Orleans, which I just discussed, the government again is controlling every single aspect of what the independent contractor is doing in terms of its end goals. The question isn't whether the government can set the goals and direct the independent contractor what to do. The question is whether the government is actually there on a day-to-day basis directing the physical activities of the individual at that specific level. And everything Your Honor addressed, again, goes to the overall scope of the undercover investigation. But that's no different in Logue from the federal government saying, and I see I'm over my time. If I could just ask you a question. Why would these businessmen do this with the government in the first instance? I mean, they undertook this. Everything you've said here is that the government was only involved to some extent, not fully, to another extent. As Judge Stratzer pointed out, there are aspects of this that there's a reason the ATF went to these legitimate businesses. As I understand, they weren't being very successful walking up to people and saying, we want 100,000 illegal cigarettes. It's going to be a cover-up type thing. So now they want to actually use a legitimate business to do so. And then once these businessmen do what businessmen do, you now complain and say, no, they are not with us. They don't work for us because they're like this community action group that the government called itself. You set up and then the court says that's not appropriate. We agree that defendants provided a service to ATF, that what they did assisted the ATF. That's certainly the case, Your Honor. But if it were true that any time somebody helped the government, they became government employees. This is not one little small little buy as a confidential form of maybe drug-type situation on a relationship. This is actually infiltrating your own business and using your own resources. And what I understand from the opposing counsel, using the only half $50,000 in this so-called account here, so they were asked to use their own money. He says it was up to a million dollars. The fact that they were using their own money underscores the lack of control, government control over their actions. I know we're going to control it, but I want to deal with that because it seems to me to inform what's going on here. We can look at it and try to be legalistic and say who's controlling what and call it deftly, but you really need to know what this big picture is because this is not a very usual type situation. But let me answer this question. Those profits that were made from that 200% and all of that, did the government get any of that or what? Or did it all go to the defendants? The record reveals that there were audits, and I understand that the money that was associated with the undercover investigations was supposed to go back to the government. Now, I can't speak to... So the end result is the government profited from this scheme, or it sounds like the government got the bigger profit from it. I don't know if I would characterize it that way, but regardless, the question here is... So tell me why you wouldn't characterize it that way if you get a 200% profit and they get like $2 per card and then what goes over here goes back into the forfeiture section for the government and they're using this money for their own operations, sending people all over the world. Why would you? I mean, what's this? Why would you ever end this scheme from a government perspective? It would be a nice thing. You get money and you got a little... I call it a slush fund. That's probably not a good way to say it. You got a special fund sitting over here. ATF is using and now once it gets opened up, it's like, oh, we didn't know anything about that. This money just showed up. We don't understand. We didn't have any control. I understand Your Honor's questions, and there's obviously a lot of facts going on in this case that it's a unique and complicated case, but for the question... That's what makes it out of the realm of just trying to make it like you're dealing with a regular confidential informant because there's a lot going on in this case. That's right, but... But let me finish. And to just isolate it and treat it in the most legalistic way you can and say control is this and therefore it is, this is a complicated case. It's got a lot of moving parts. You've got a judge who sat on this case, as I understand, four years, barely seen a judge, a different weight on it, then you've got another judge coming behind and it goes differently. I understand, Your Honor, and I think the more you step back and take a big picture look at this case, the more it becomes clear that these individuals were not just government employees subject to control. They were running their own business. They benefited from this. You're right, the government benefited from it. In some ways they were partnering together, but that does not an employee relationship make. And if you look at the case law, I do think it's very helpful. Did you say partnering together? Are you saying they partnered in how all this went about? I mean, at least in the results of it. I think there are a lot of analogies you can use, Your Honor, in looking at the relationship, but the one analogy that really doesn't fit is an employee relationship. And if you look at the analogy of somebody being a supplier and you've got people down here, government being in a position of being a supplier, you've got dealers out here or someone who's got to run an operation. I think in some respects that's right, but a supplier-distributor relationship is not an employer-employee relationship. I'm thinking in terms of drug distribution and supply. Well, that has a more nefarious implication that I wouldn't accept, Your Honor. But the analogy fits when you talk about supplier distribution. You can say it's legal or not. Legal one's legal, one's not. But the analogy fits, does it not? In some respects it does, but, again, that's not an employer-employee relationship. And just to answer, I think, an underlying strain under all of Your Honor's questions, the government frequently retains independent contractors and gets a lot of benefit from it. I mean, the whole point of it is that this is going to be a beneficial relationship. It can be a longstanding relationship. It can be a relationship where the independent contractor has one job and it's to work for the federal government. But ultimately, if they're an independent contractor and they're not subject to day-to-day control and they don't satisfy the other aspects of the task, then they're not employees for purposes of the Westfall Act. Okay, now I've got a question. Oh, of course. It was reported. I'm sure we've completely explored everything. Judge Wynn was interested in it. The asset purchase agreement was executed. The defendant sold their business. My question is this. With regard to analysis of the control issue, is your analysis the same or what went on before the asset purchase agreement as it was afterwards? Are they both the same analysis, the same answer, same result? Yes. And I just want to point out the defendants obviously argue, place a lot of emphasis on the facts after the sale. But it would be very odd to think that, you know, for the five years of the operation before the sale, they were not employees. And then they suddenly became employees at this point where they sold their business. And the important point for the court's analysis is that, again, the defendants were undertaking the exact same actions with respect to, you know, the day-to-day management. But they had no more assets. They'd sold all their assets. That's right. And I think the fact that they were running a legitimate business before, you know, further supports the fact that they were not employees. But, you know, once they sell the business to plaintiffs, and, you know, at least Small becomes an employee for plaintiffs, they're still undertaking the same actions for the government and they still have the same day-to-day control. They still – it's not like they've signed a new agreement with the government that changes their status. Okay. I think I understand. Thank you. Let's hear from Mr. Breas. Thank you very much. We have pleased the court. There is indeed a lot going on here, and I'm hoping to be able to clarify some of it. I'd like to start with the last question that was asked, Your Honor. Nothing really changed when the business was sold in the following respect. They ran a wholesale business that they owned before they sold it to us. After they sold it to us, they continued managing that very same wholesale business that we owned. Small was the executive director of it. Daniel was the president of it. That was still the majority of what was going on, is they were now running Big South Distribution, BSD. So it just died off until the property had changed. Exactly. But it was the same warehouse. Most of their time was still spent on that, et cetera. So they point this out as a moment of demarcation. It is true that Big Sky, which ended up being sort of the company of theirs through which, after the sale, they ran these transactions through Big Sky's books, the transactions with the government, were related to the government. But that really says nothing about defendants' day-to-day activities changing at all, because they didn't. Secondly, and I'd like to – Let me ask you before you leave that topic. I'm going back to where I started with the balance. You have a contract claim on the asset purchase agreement, and that's not in this case, correct? Whatever contract claim you've got, you've still got it. Yes. So we're dealing with a torque claim, and your torque claims cover, for lack of a better word, fraud in the asset purchase agreement and frauds after that. Yes. Is that right? So as I understand what the appellants have said, they say that with respect to the asset purchase part of your torque claim, that you didn't make that argument in the district court, and that you have waived it. So tell me your response to that. It's absurd. We raised it first, Your Honor, at DE 490, which was our initial response to the petition to substitute. We raised it in the next filing we made, which was the post-evidentiary hearing brief, which is DE 997. Pages 9 through 11 of that filing discuss the evidence related to this issue in detail. We then raised it in our memorandum in support of the motion to reconsider at DE 841. We raised it in our memorandum in support of renewed motion to reconsider at DE 826, pages 10 and 11. There's no doubt whatsoever that this issue has been raised. And these sites that you gave us were before Judge Fox or Judge Boyle? Both. Okay. If I may, I'd like to address, I don't think the factual disputes really end up being dispositive, but there's so much going on here that's not true that I just feel a bit of a duty to clean it up. So first of all, the $12 million that we talked about that Small and Daniel made in profit, you can find the evidence for that at JA 1221 through 1227. That's their supplemental declarations where they ended up having to restate some evidence because we caught them in a fib. And so they restated what their income was for the time period in question from these operations. And so they made $6 million apiece in a little less than two years from it. This was not money that went back to the management account, Your Honors. This was in their income tax. This was money they got back, even if one assumes. So is this money they made off of selling stuff to your clients or other people? It was money they made selling stuff to our clients, Your Honor. This was the sale of the Palermos to our clients. It was the sale of our own cigarettes back to us where, Your Honor, actually it was a 450% markup, not a 200% markup. Was that amount $12 million or was it? No, that amount was $600,000. They bought the cigarettes from us for $134,000, and they sold them back to us for I think it was $747,000. The $12 million. Is that the total profit they made or was there more? It's the total profit that they made that we know of, Your Honor, that's on their taxes. And they gave no money back to the government? Well, how it worked was this, Your Honor. They did give some money back. The government said they did. Well, this is how it worked. I can explain it all, and I can give you sites if that's even better. You wouldn't know what they gave back to the government, would you? Well, yes, I would because we've got evidence on it. How this worked is the management account was their account. It wasn't the government's account. They opened it, and Agent K, who gave the 30B6 for the ATF, testified at 1-1-9-9 that that account was theirs to run. Agent Lesnak testified at 9-41 and 9-88-89. K testified at 11-76. And how it worked was money from all these various transactions, it wasn't at least clearly money that had to be forfeited. It wasn't in a criminal transaction itself. It went into the management account. The only money that came out of that management account were, A, some of it was later determined to have been involved in a criminal transaction. That was subject to forfeiture. Money also went out of the management account to pay the government back any expenses the government might have incurred. The pages I gave you, K and Lesnak, say any money that was left over went to Small and Daniels. That's where their profit came from. That's where the $12 million came from. You represent who in this statute? I represent the U.S. Tobacco Cooperative, Inc. and U.S. Flu Cured Tobacco. The co-counsel represents the United States. So his representation as to what the United States... And he's not my co-counsel, Your Honor. At least in terms of whether the United States was or Europe or not. It would seem to me that the counsel for the government, representation of what the government did, might have something a little bit more than someone who's a third party saying what the government did. Your Honor... And they're on the same side of the table, even though they're not co-counsel. They're sort of on the same side of the table. They could be on the opposite side of the table, depending on how... Are you asking for the same thing? In this case, we're both asking for the district court to be affirmed, Your Honor. And we are the party, we are the plaintiff. What are you asking for? What are you seeking in this action? Oh, in this action, we're seeking to get our money back, Your Honor. We were defrauded of millions of dollars in the asset purchase agreement first, and then in these Blairmo transactions and in the Wild Horse transaction as well. The government is not seeking to get money back. Seeking just simply to say they're not employees. Just saying they're not an employee, and the government is right about that. Because if they are employees, then what happens in your action? If they are employees, Your Honor, then our claims that are based on intentional torts will go away. Because the government, how the FTCA works, as Your Honor knows, is the government waives sovereign immunity generally for suits based on actions by employees within the scope of their employment. But there are exceptions to that waiver of sovereign immunity, and one of the exceptions is intentional torts. There's an exception to that exception, too, but we'll leave that be for now. One, I think, overarching thing to think about when you're looking at this case, though, now that we're talking about the FTCA, is it is a waiver of sovereign immunity. And so the conditions to that waiver have to be interpreted narrowly. This Court has said that in Wood and in other cases as well. The definition of employee is one of those conditions of the waiver of sovereign immunity. So the definition of employee, whether someone meets it, has to be construed narrowly. The courts in applying that have largely adopted this control test from Section 220.2 of the Restatement Second of Agency. Under that test, you do look to see whether there is authority to exercise day-to-day control and detailed performance of physical activities. They're saying those things in order to help the courts distinguish between what's an employee and what's an independent contractor, because otherwise that line can get a bit fuzzy. And so they're saying if there is no writing that establishes that you're an employee, there is no law that says you're an employee, then it's a tough test to meet, and you've got to meet it in those ways. In this case, the only writing, and writing is the most probative thing you've got in these cases in general, the only writing you've got is Carpenter's confidential informant agreement. And what does that writing tell us? He says straight out, I agree I'm not an employee and I won't hold myself out as one. You go from there, and that's very probative. He's got a very tough burden, then, to go up that hill and prove that there was control over detailed physical performance of his activities. The most he has demonstrated is essentially the government set some specs. Essentially Judge Fox just got it wrong twice. Judge Fox did get it wrong twice. Judge Boyle came back, and what changed his mind? What was different about that? The law didn't change, or what? I think it was mostly that he thought that, with due respect, that Judge Fox just blew it on the facts, Your Honor. Can he do that? Can he revisit another judge's order because he thinks the other one's wrong? If he thinks it's clearly erroneous, he can, Your Honor. That's, as Your Honor noted, the third. There is an or between the three categories. The causes are manifested, Judge. That's exactly right, Your Honor. Do you think that's the ground that he went on? I'm sure that that's the ground that he went on in whether they are federal employees. Does he say that? Does he say he finds a manifest injustice? What he does, Your Honor, is he says right up front in the opinion that he's got to find one of those three things. And we had sought rehearing, Your Honor, not only based on the new evidence that appellees have discussed, but also based on clear error as the government had. Given the suddenness of Judge Fox's retirement, Judge Boyle comes into the case, I don't know that he was required at the end of that opinion to say, and you clearly erred. And he didn't. And maybe that's a bit of gentility, but I don't think that we can say, therefore, Judge Boyle failed to apply the law that he cited four pages earlier. I think he understood the law. We have looked, by the way, Your Honor, I think it is fairly implied, yes, because he stated what the standard was and said where he came out on the facts and reversed. How do we know that it's not just I've got a different view of the facts? I mean, that's not enough to change the law on the case. That's just not enough. So how do we know it's not more than that, that it was more than that? Your Honor, I think we have to give some credit to Judge Boyle to understand that when he cited the right standard, clear error and manifest injustice, and four pages later, after finding the facts he found, including the ultimate fact that there was inadequate control, and overruled, and he said he was doing it cautiously because he understood that overruling another judge in the same district, et cetera, is an unusual thing. But he did. But that's not the answer he gave you before. I mean, the question is how do you know because, as Mr. Parsons pointed out, he sort of went out of his way to say, it's tough to stand up and say clear error. But if you're going to, if a judge is going to go completely different from another judge, I mean, typically just on going the reasonable way and say, okay, I see it differently, because a lot of times we see stuff different up here. We'd like to go a different way, but we're bound in terms of the review. It would seem to me that's critical to say, okay, even if it's a matter of respect or what else, the reason Judge Fox got this wrong is because. What? Okay. If I may, I've got three responses to this. Number one, and this isn't a duck, but it is my first response, which is I don't believe that this has been preserved. You don't think what? I don't think that this argument was preserved. The page that was cited, page, I think it was 36, doesn't make this argument. This argument, if you think they make it, if you can squint hard enough to get there, is in footnote 18 on page 37. But what that footnote's really saying is that Judge Boyle didn't find facts in enough detail. His opinion wasn't detailed enough. And specifically the argument they've waived is what? This argument that they've waived is there was an abuse of discretion because the judge made no finding of clear error. That argument they never made. Now, in terms of whether, if they had made the argument, and by the way, they didn't make it in the reply brief when we called them out in our responsive brief for waiving it. They dropped it in the reply. But why else would you go this way? Your Honor, there is not a different standard, depending on whether you are overruling yourself or whether you're overruling a district judge who just retired and left the bench. Now, this Court has said we should approach the latter with some caution. It's more of a directive to district courts to think about it a little harder. But there's not a different rule that you're following. We've searched high and low. We have found not a single case where a court of appeals has overruled a district court judge for reconsidering a decision that he believes he got wrong and coming out with the decision he got right. Now, that judge might get a rule because the court of appeals disagrees with the final decision and thought it was clear error. But never have we found a case where a court has overruled. Why? Because the district court's ultimate duty is to get the decision right. Judge Boyle here recognized what the standard was. We believe he applied it, and we think he got it right. I don't see any reason to overrule it. We do think the rule's there for two reasons, by the way. We think the rule's a good rule in the sense that it tells litigants, don't go raising arguments and asking them to reconsider all the time. We want you to save it for circumstances where there's clear error or change of law, et cetera. And we think it's a good rule for district court judges to keep in mind because they don't go worrying every decision they made as to rethinking it a little later, maybe I got that a little wrong. It's telling them, you make the decision, you move on unless there's clear error. We think that Judge Boyle understood that. You can't find any of what I just said in the treatise, but I think it's correct. In terms of how we look at the law here, you know, it comes down to a situation where at best you've got an independent contractor. If you have an independent contractor that builds your house, that independent contractor might have lots of specifications. You might even have handed them the architect's drawing. It may take three years to build your house, and with detailed things as to what they're supposed to do. But the means with which they accomplish it are up to them. And it's the same here. The testimony here is when they were doing a job, they negotiated with the bad guys like any bad guy negotiates with any other bad guys. No one scripted their conversations, told them exactly say this, don't say that. These guys were given general specifications and acted on them. At most, we've got independent contractors, and I think that no case has ever found employee status on facts remotely like this. Do you agree that the standard of review for Judge Boyle's order is the use of discretion? Yes, I do, Your Honor. And I don't think there's any standard of this Court's review. While we're talking about it for Judge Fox's earlier decisions, those were vacated and really don't have any other place formally in the judicial process. Thank you, Your Honors. Much appreciated. Yes, sir. Yes, sir. I want to start out. I was searching for what I had written out that was the answer to Judge Agee's question about the shows to sell to the plaintiffs. I couldn't find it on my feet a while ago, but I did find it just now. This comes out of the deposition of Chris Small. The pinpoint site was appendix page 751. But here's the rest of the exchange. We were trying to do good by your plaintiff. It's $2 cheaper than market value. Take it or leave it. If you don't want it, that's fine. I was trying to help your client make money. I should have, in hindsight, sold it to somebody else and let them make a bunch of money. I was told what to sell it for at the direction of the government. There is not a distributor in the southeast who have not taken that product for $2 more than that. That's pages 751, 757, 777, and 784. To the government's point that the DOJ only rejected the petition based on not being federal employees, the government's response to the petition for certification at appendix page 435 says the Department of Justice has declined to certify either employment or scope of employment for defendants in response to their petition. Now, I will say the first time we were told that our request for West Falls certification made in December of 2015 had been denied was on June 22 of 2016 when the government filed their response to our petition telling us for the first time it was rejected. We filed on June 1 because that was a despised in motion deadline under the pending scheduling order at the time. Another point I wanted to make as far as who was involved and how embedded they were, in response to the petition the government conceded that Mr. Small and Mr. Carpenter were absolutely essential to numerous criminal investigations and some of the targets were specific while others were unknown until they proposed corrupt deals to Carpenter, other informants, or ATF, undercover special agents acting as employees of Carpenter's company. And that is at appendix page 433. I wanted to get to another thing. There was a discussion about control and I found this in digging around getting ready for today. Wendy Davis was the bookkeeper for our clients. She testified that Agent Lesnack mostly controlled the fourth tier management account. She received instructions from him nearly daily. Lesnack also told her to reimburse agents' travel expenses and such out of the management account and also told her to pay charitable contributions. Those are found at ECF 1041 pages 148, 147, and 151. To the point about the difference in this case and others, I think the court's made this point in its questions, but I've got 12 seconds. I've got to go for it. All the cases that found Westfall employment were one-offs, one project, one operation. The testimony here is these men worked with hundreds of agents. They made hundreds of deals. They returned $100 million to the treasury in forfeitures and had 100 defendants successfully prosecuted. I have one more thing, Judge, if I can get away with it. If I can't, I won't. You kind of look like you're ready for me to go. I will make one more point. There is in the record, and if I have one second to find it, it was just one of those where I looked at it and said, gosh, you're going to hate yourself if you don't make that one. This is awkward, and I am sorry. Okay. The wild horse deal. Those are government cigarettes. The government instructed Carpenter & Small to buy those cigarettes from U.S. Flu Cure, which was their cigarette manufacturing subsidiary. This appears at appendix 601 to 04. Flu Cure had made $50,578 on our government purchase of those cigarettes. We then sold those cigarettes back to them when they had served, back to them, and they made $132,289 on that. I'm sorry. Back to the plaintiffs. Yes. Okay. They were sold $2 below market back to the plaintiffs for them to resell. So we, out of all that, kept $117,500 to reimburse us for prior costs. At the end of the day, the plaintiffs made more money on those cigarettes than we did. Thank you. Okay. We will come back to the council and then take a short recess. Thank you all for your patience. This honorable court will take a brief recess.
judges: William B. Traxler Jr., G. Steven Agee, James A Wynn Jr.